PETERSON, Judge.
Anna Patricia Aloisi appeals the final judgment dissolving her October, 1988 marriage to Lambert G. Aloisi. We vacate the final judgment except that portion dissolving the marriage and remand for further proceedings.
When the parties married, the husband was age 68 and the wife was approximately seven years younger, and neither possessed more than a few assets of small value. The husband earned a $50,000 per year income as a consultant in the insurance industry and had been residing with the wife in her rented apartment in New York. His income did not reflect the masters degree in business administration and philosophy or the substantial success that he enjoyed earlier in life as the chief executive officer of a life insurance company. The company, which he founded, grew between 1967 and 1976 into an $11 billion company. On the other hand, the wife, whom he had known for many years before the marriage, left high school before graduation in order to help her parents financially. She had earned $8 per hour as a nursing assistant before she retired, at the beginning of the marriage, on a small pension and social security benefits of less than $700 per month. She was 64 years of age at the time the dissolution became final some three and one-half years later.
Shortly after the parties were married, business acquaintances of the husband prevailed upon him to investigate and eventually lend his reputation to and take over the management of a financially-troubled insurance company located in Florida. The company, National Heritage Life Insurance Company (Heritage), substantially improved its premium sales while he was its CEO. His annual compensation from Heritage grew rapidly from $75,000 in 1990 to $235,000 in January, 1992.
The parties’ living standard also skyrocketed during the marriage. They purchased a home together in 1991 for $230,000, spent $50,000-$60,000 on improvements and $40,-000-$50,000 on furnishings. They were also able to acquire a collection of Tiffany lamps valued by the wife at $10,000, but by the husband at $100,000.
Debt was also incurred during the marriage. The husband borrowed $50,000 as a down payment on the home and the parties incurred a $190,000 mortgage. A Lincoln automobile was purchased but it was subject to a $12,000 lien at the time of the dissolution. Credit card balances by the date of the dissolution proceedings had reached $17,000; $38,000 was due to the husband’s brother, Alfred Aloisi, to repay a loan, and $135,000 was payable to husband’s acquaintance, Don Goodman.
While the wife has raised eight errors in the proceedings and judgment, the issues of merit involve the stock of Tri-Atlantic Holdings, Inc. (Tri-Atlantic) and failure to award alimony.

Tri-Atlantic Holdings, Inc.

During the marriage, the husband accumulated 100% of the capital stock of Tri-Atlantic without having made any cash payment or incurring any debt. Tri-Atlantic owns a majority interest in the stock of Lifeco Investment Group, Inc. (Lifeco) and the husband is its board of directors chairman and CEO. Lifeco in turn owns 100% of the outstanding stock of Heritage and another Lifeco subsid *93 iary, Lifeco Marketing, Inc., the marketing arm of Lifeco. The husband was given 10% of the Tri-Atlantic’s stock as an inducement to become CEO of Heritage, and, because of governmental requirements, the remaining shareholders had to sell their stock. TriAtlantic purchased the remaining 90% of the stock as treasury stock and in order to acquire it incurred a debt of $4 million that was payable on July 1, 1993 plus 8% interest.[1] The record does not reflect how that debt was to be retired, although evidence presented at the dissolution hearing indicated a plan to raise funds through a sale of additional stock. Of course, the husband would no longer be the sole stockholder if such a sale were accomplished.
During the relatively short duration of the marriage, the husband, through his association with the three corporations and with the aid of other officers, turned Heritage into a viable business. The husband took over Heritage in the latter half of 1990 when the company’s total revenue for the full year was $23 million. As of April 1992, Heritage was grossing premium income on the average of $20 million per month. The increase per month over the previous six months was at a greater rate than comparable companies according to the husband; the increase in sales per month from 1990 is over 1000%.
However, this phenomenal growth was not without problems. While the premiums grew, the exposure to insureds increased and the reserve requirements of regulatory insurance agencies had to be met. Investments had to be made with the premium income and the investment practices of management prior to husband’s takeover were the subject of investigatory hearings by agencies.
The husband argues that the TriAtlantic stock is a non-marital asset because it was his reputation and experience acquired prior to the marriage that was responsible for the acquisition of the stock after marriage. This argument is incorrect. See, Thompson v. Thompson, 576 So.2d 267 (Fla.1991). Contrary to the husband’s argument and the trial court’s finding, the stock of TriAtlantic is clearly marital property subject to equitable distribution.
The trial court also found the stock to have little or no market value, and to be subject to certain transfer restrictions imposed by the Delaware Insurance Department. The only testimony as to value came from the husband. That testimony is confusing in that it ranges from a market value of $2.5 million to zero. It is not entirely clear from a review of the record that the husband meant to testify that the higher figure was market value rather than book value before the corporation became indebted for $4 million to acquire all of its own outstanding stock except the ten percent owned by the husband.
The value of the Tri-Atlantic stock owned by the husband could be of less importance if the stock was simply distributed equally to the parties. That solution would have allowed each of the parties to realize equally whatever bad or good fortune the related corporations may experience in the future. However, the husband presented evidence of and the trial court found restrictions on transferability that would seem to foreclose that idea. Even wife’s counsel agreed that distributing a portion of the stock to the wife was not a very practicable alternative:
That stock is — yes, it is legend (sic) so he can’t transfer it without the permission of the insurance commissioner. I even agree with Mr. Young but it would be difficult at best to transfer a portion of the stock to Mrs. Aloisi on the grounds that it would interfere with the smooth running of the business. That is a valid consideration.
The wife’s attorney went on to argue that a sizable lump sum distribution would be a fail* alternative to the award of the stock. However that could be unfair to the husband if the trial court’s valuation of zero ultimately proved to be accurate by cessation of the operations of Heritage by regulatory order or other future events causing the stock to become worthless prior to the husband having an opportunity to benefit from it.
*94 Notwithstanding the restriction on the transfer of shares, the trial court’s final judgment contains a confusing and troublesome provision that undermines its finding that “this stock [Tri-Atlantic] ... is non-transferable on its face and [sic] as a result of restrictions placed upon its transfer by the Insurance Department of the State of Florida and the State of Delaware, as well as regulations related to that industry.” The undermining provision is found in the very next sentence of the final judgment which states,
[fjurther, the Court finds that the Husband’s interest in that sock (sic) is subject to an agreement to convey fifty percent (50%) to Patrick Smythe who was directly responsible for the Husband’s acquisition and receipt of the stock in the first place.
The only evidence establishing an obligation to Smythe to convey an interest in the stock was the husband’s testimony. He testified that he committed himself to Smythe because Smythe brought him into the company and that is why he agreed to give Smythe half of the stock he acquired once the insurance commissioner approves. Based solely on this evidence of some sort of “commitment,” an implicit finding was made that such “commitment” took priority over any marital interest the wife may have had in the property. But there is absolutely no credible evidence of a legally binding agreement in the record that would interfere with the wife’s interest in the Tri-Atlantic stock, and even if such evidence were present, there is nothing to explain why the wife could not also have an interest in whatever remaining Tri-Atlantic stock the husband owned, subject to the same non-transferability restrictions that must have affected the commitment to Smythe.[2]
The Tri-Atlantic stock was the main feature of the final hearing. The gap between its potential worth or worthlessness is extremely great and fairness requires that intense consideration be given to the distribution of the shares, if it is at all possible. Given the inconsistent findings of the final judgment relative to non-transferability, and the alleged obligation to transfer a portion of the husband’s shares to Smythe, this matter must be remanded to the trial court for reconsideration.

Failure to Award Alimony

The parties married each other at a time in their lives when most persons are ready to retire although neither were financially secure. Each was apparently content to accept that station in life in order to share the marital relationship. An unpredictable and unusual event that occurred during the marriage changed that situation and propelled them into financial success and enabled them to enjoy a luxury home, substantial income and a potentially valuable investment.
The present judgment leaves the 64 year old wife without a home, with a car payment on a Lincoln automobile, and a $676 per month income from a pension and social security. The husband, on the other hand, is left with an income of $235,000 per year, which, based on his salary history, has the potential to continue to spiral upward. The husband also has the potential to obtain the fruits from the Tri-Atlantic stock venture which may prove to be substantial if realized.
An adjustment in the financial positions of the parties is required. This adjustment should include consideration of an award of permanent alimony as well as further consideration of the issue of the transferability of the marital Tri-Atlantic stock. While an award of permanent alimony in this case might seem inappropriate because of the short duration of the marriage, it would allow the wife to share in the good fortune that was realized during the marriage; it would *95 also allow the husband the opportunity to reduce or eliminate the alimony payments upon a showing of an appropriate substantial change of circumstances. On the other hand, permanent alimony may not be necessary or may be less essential if an equitable distribution of the Tri-Atlantic stock is accomplished.
We remand to the trial court for further proceedings consistent with this opinion.
REVERSED; REMANDED.
COBB and DIAMANTIS, JJ., concur.

. The $4 million is owed to the seller of the treasury shares who has been found by the Delaware Department of Insurance to be unqualified to own a controlling interest in an insurance company. It is this disqualification that resulted in Tri-Atlantic’s purchase of the treasury stock.

. Because of the lack of evidence establishing any legal interest that Smythe had in the TriAtlantic stock, we must surmise that the trial court's order found that Smythe, a non-party, had an equitable interest. If that equitable interest does not violate the non-transferability restrictions, why cannot the wife also acquire an equitable interest in the dissolution proceedings? See Good v. Good, 458 So.2d 839 (Fla. 2d DCA 1984) ("[I)n effecting an equitable distribution of marital assets, the court might have awarded the wife some equitable portion of the husband's corporate stock.”); Novak v. Novak, 429 So.2d 414 (Fla. 4th DCA), rev. denied, 438 So.2d 833 (Fla.1983).